| HEALTHY GULF AND SIERRA CLUB | * | NO. 2024-CA-0286 |
|---|---|---|
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| SECRETARY, LOUISIANA DEPARTMENT OF NATURAL RESOURCES | * | FOURTH CIRCUIT |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 23-0764, DIVISION "E"
Honorable Eric A. Bopp,
* * * * * *
**Judge Nakisha Ervin-Knott**
* * * * * *

(Court composed of Judge Paula A. Brown, Judge Tiffany Gautier Chase, Judge Nakisha Ervin-Knott)

Elizabeth Livingston de Calderon
Zora Djenohan
EARTHJUSTICE
900 Camp Street, Suite 303
New Orleans, LA 70130

    COUNSEL FOR PLAINTIFF/APPELLANT

Elizabeth Baker Murrill
ATTORNEY GENERAL
Warren B. Bates, Jr.
Machelle R. L. Hall
Morgan D. Rogers
Assistant Attorneys General
LOUISIANA DEPARTMENT OF JUSTICE
P.O. Box 94005
Baton Rouge, LA 70821

    COUNSEL FOR DEFENDANT/APPELLEE

Richard D. McConnell, Jr.
Lauren J. Rucinski
KEAN MILLER, LLP
400 Convention Street. Suite 700
Baton Rouge, LA 70802

COUNSEL FOR INTERVENOR/APPELLEE

**AFFIRMED**
**December 23, 2024**

Healthy Gulf[1] and Sierra Club[2] (collectively "Appellants") appeal the trial court's February 2, 2024 judgment, which affirmed the State of Louisiana, Department of Energy and Natural Resources' ("LDENR") approval of the Evangeline Pass Project ("Project") and granting of a coastal use permit ("CUP") to Tennessee Gas Pipeline Company ("TGPC"). After considering the record before this Court, we affirm the district court's judgment upholding the LDENR's decision to approve the CUP in favor of TGPC.

## BACKGROUND

### A. Legal Background

The Louisiana Constitution article IX, § 1 establishes the public trust doctrine, which mandates "[t]he natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety,

---

[1] According to the petition for judicial review, "Healthy Gulf is a non-profit organization based in New Orleans, Louisiana whose mission is to collaborate with and serve communities who love the Gulf of Mexico by providing the research, communications, and coalition-building tools needed to reverse the long pattern of over exploitation of the Gulf's natural resources."

[2] According to the petition for judicial review, "Sierra Club is a non-profit organization whose mission is to explore, enjoy and protect the wild and beautiful places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist people to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives."

and welfare of the people." This article of the Constitution orders the legislature to "enact laws to implement this policy." In line with this mandate, the LDENR – through its Office of Coastal Management ("OCM") – is a state agency responsible for managing Louisiana's coastal zone under the State and Local Coastal Resources Management Act of 1978 ("SLCRMA"), as provided for under La. R.S. 49:214.21 *et seq.* The function of the OCM is, in part, to "receive, evaluate, and make recommendations to the secretary[3] concerning applications for [CUPs]." La. R.S. 49:214.26(B)(1).

Under the SLCRMA, no one is permitted to "commence a use[4]" of the coastal zone without a CUP. La. R.S. 49:214.30(A)(1). The LDENR issues a CUP pursuant to criteria provided for in the Coastal Use Guidelines ("Guidelines") found in LAC 43:I-701–719. Prior to the issuance of a CUP, the LDENR must ensure "that the activity for which application is being made is consistent with the state's master plan for integrated coastal protection." La. R.S. 49:214.30(A)(2). Further, "[t]he coastal use permit decision must be consistent with the state program and approved local programs for affected parishes and must represent an appropriate balancing of social, environmental and economic factors." La. R.S. 49:214.30(C)(3).

### B. Factual and Procedural Background

On February 7, 2020, TGPC submitted an application to the LDENR for a CUP to construct, operate, and maintain facilities as part of the Project. Specifically, the Project consists of two 36-inch natural gas looping pipelines[5] – the Yscloskey

---

[3] "Secretary" is the secretary of the LDENR or his designee. La. R.S. 49:214.23(12).

[4] "Use" means "any use or activity within the coastal zone which has a direct and significant impact on coastal waters." La. R.S. 49:214.23(13).

[5] According to TGPC's Compensatory Mitigation Plan, "[p]ipeline loops are those pipeline segments which are laid parallel to another pipeline and used as a way to increase capacity along what is possible on one line. These lines are connected to move a larger flow of gas through a single pipeline segment."

Toca Lateral Loop ("YTL Loop")[6] and Grand Bayou Loop ("GB Loop")[7] – totaling approximately 13 miles in length, a new compressor station ("CS 529")[8], and a modification to an existing compressor station ("CS 527")[9]. According to the Support Document submitted in conjunction with TGPC's CUP application:

> The purpose of the Project is to provide up to 1,100,000 Dth/d of firm transportation capacity on Tennessee's interstate natural gas pipeline system for delivery to Venture Global at a proposed interconnection with Gator Express Pipeline ("Gator Express") in Plaquemines Parish, Louisiana to supply feed gas for Venture Global's natural gas liquefaction and liquefied natural gas export facility in Plaquemines Parish, Louisiana ("Plaquemines LNG Terminal").

> The Project is needed to support the binding precedent agreement executed between Tennessee and Venture Global for up to 2,000,000 Dth/d of firm transportation capacity under which Tennessee has agreed to construct, acquire, and operate the necessary facilities and capacity for the Project. Venture Global's request will be met through Tennessee's construction of certain facilities and Tennessee's lease of certain capacity from SNG.

> Of the 2,000,000 Dth/d of capacity needed by the Project Shipper, 1,100,000 Dth/d will be created by the Project. Therefore, unless Tennessee proceeds with construction of the Project, Tennessee will be unable to completely satisfy the Project Shipper's expressed need for additional firm transportation capacity to transport feed gas to Gator Express by December 1, 2022, the required in service date in the executed precedent agreement.

On August 6, 2020, LDENR placed the proposed Project on public notice in accordance with LAC 43:I-723(C). During this formal twenty-five day notice period, one public comment was received – a formal objection from Healthy Gulf. From

---

[6] The YTL Loop is approximately 9.1 miles of 36-inch looping pipeline along TGPC's existing 24-inch 529D-100 Yscloskey Toca Lateral located in St. Bernard Parish, Louisiana. TGPC intends to locate the YTL Loop within and adjacent to the right-of-way ("ROW") associated with its existing Yscloskey Toca Lateral.

[7] The GB Loop is approximately 4.0 miles of 36-inch looping pipeline along TGPC's existing 36-inch 500-2 Line in Plaquemines Parish, Louisiana. TGPC intends to locate the GB Loop within and adjacent to the ROW associated with its existing 500-2 Line.

[8] CS 529 will be located at an existing abandoned compressor station site along TGPC's existing 500 line system located in St. Bernard Parish, Louisiana.

[9] The existing CS 527 is located in Plaquemines Parish, Louisiana.

August 2020 to November 2022, the LDENR requested information from TGPC on fifteen occasions in order to completely evaluate the proposed Project and its potential impacts. TGPC was responsive to LDENR's requests and provided supplemental documentation – including detailed hydrological reports, site assessments, alternative reviews, and mitigation data.

The LDENR conducted a public hearing on October 5, 2022, which allowed further comments to be provided by interested parties. A total of four speakers were registered, including a TGPC representative and three members of the public on behalf of the Sierra Club. The three Sierra Club representatives opposed the Project. A total of 614 comments were received throughout the permit review process including those received during the formal twenty-five day notice period. A majority of the individual comments submitted stated opposition to the Project, with approximately seventeen percent (17%) – or 107 – of the comments received from individuals located within Louisiana.

After considering the record data and public comments, LDENR issued a thirty-two page Basis for Decision memorandum ("Decision") on April 25, 2023, concluding TGPC had adequately minimized potential adverse environmental impacts. LDENR granted a CUP to TGPC, finding that the benefits of the Project outweighed any adverse impacts.

Appellants filed a petition for reconsideration of the CUP on May 5, 2023. Seventeen days later, the LDENR denied this petition, stating Appellants' concerns had been previously addressed through the extensive review process. Following the denial, Appellants filed a petition for judicial review of the LDENR's Decision in the 34th Judicial District Court for St. Bernard Parish.

4

The trial court conducted a hearing on November 20, 2023. Thereafter, on February 2, 2024, the trial court ruled in favor of LDENR, affirming the decision to issue the CUP. The trial court found no basis to challenge the LDENR's analysis and determined Appellants' concerns were adequately addressed. On March 20, 2024, Appellants filed a motion for an order of appeal, which the trial court granted on the next day. This timely appeal follows.

**STANDARD OF REVIEW**

The Louisiana Administrative Procedure Act applies to the judicial review of this case. *See Joseph v. Sec'y, Louisiana Dep't of Nat. Res.*, 2018-414, p. 3 (La. App. 5 Cir. 1/30/19), 265 So.3d 945, 949 (citing La. R.S. 49:950, *et seq.*; La. R.S. 49:214.35(F); La. R.S. 49:964). Under the SLCRMA, a party aggrieved by a CUP decision may seek judicial review of that decision by filing a petition "in the district court of the parish in which the proposed use is to be situated…." La. R.S. 49:214.35(E). In reviewing a CUP decision, the district court is exercising its appellate jurisdiction pursuant to La. Const. art. V, Sec. 16. Louisiana Revised Statutes 49:978.1(G) states that:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of the evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.

When reviewing the district court's judgment, "the court of appeal owes no deference to the factual findings or legal conclusions of the district court, just as the Louisiana Supreme Court owes no deference to the factual findings or legal conclusions of the court of appeal." *Joseph*, 2018-414, p. 5, 265 So.3d at 950. Accordingly, "an appellate court sitting in review of an administrative agency reviews the findings and decision of the administrative agency and not the decision of the district court." *St. John the Baptist Par. v. Dutch Bayou Dev. Co.*, 2019-357, p. 7 (La. App. 5 Cir. 1/29/20), 290 So.3d 292, 297 (citing *Sylvester v. City of New Orleans Through Code Enforcement and Hearings Bureau*, 2017-0283, p. 4 (La. App. 4 Cir. 10/11/17), 228 So.3d 285, 287). Considerable weight should be given to an administrative agency's construction and interpretation of its rules as provided for under the statutory scheme that the agency is assigned to administer, "and its construction and interpretation should control unless the court finds it to be arbitrary, capricious, or manifestly contrary to its rules and regulations." *Joseph*, 2018-414, p. 6, 265 So.3d at 950 (citing *Ford v. State, Dep't of Health and Hospitals*, 2014-1262, p. 6 (La. App. 4 Cir. 3/6/15), 166 So.3d 332, 337). Therefore, "[i]f the evidence, as reasonably interpreted, supports the determination of an administrative agency, its orders are accorded great weight and will not be reversed or modified in the absence of a clear showing that the administrative action is arbitrary and capricious." *Id.* at p. 6, 265 So.3d at 951. "[T]he test for determining whether the action is arbitrary and

6

capricious is whether the action taken is reasonable under the circumstances." *Id*. With this understanding of the applicable standard of review, we now consider whether the LDENR's decision to issue a CUP to TGPC was arbitrary and capricious.

## DISCUSSION

On appeal, Appellants present two assignments of error: (1) the district court erred when, acting in its appellate jurisdiction, it affirmed the LDENR's decision; and (2) the district court erred when it substituted its own findings on Guideline 711(A) for the agency as if it were exercising original jurisdiction in a "trial de novo" over this administrative review and, alternatively, when it substituted its own findings that were contrary to the Record to uphold the LDENR's decision. Regarding the first assignment of error, Appellants maintain the LDENR violated the public trust doctrine, SLCRMA, and its own Guidelines because: (1) its written decision only weighed the Project's benefits and neglected to account for or weigh the Project's costs; (2) it expressly declined or failed to consider categories of real and potential adverse environmental impacts – as required by the Guidelines and Constitution – including potential impacts from pipeline system leaks, accidents, and explosions, and cumulative and secondary impacts related to climate change; and (3) it failed to apply Guideline 711.A asserting the Project is "neither commercial nor industrial," thus it could substitute one applicable Guideline for another despite Guideline 701's directive to comply with "all applicable guidelines." As it relates to the second assignment of error, Appellants maintain the trial court correctly rejected the LDENR's rationale for not applying Guideline 711.A, but erred in upholding the LDENR's decision on a different, yet flawed basis.

7

***Argument Number One: The LDENR's written decision only weighed the Project's benefits and neglected to account for or weigh the Project's costs.***

Appellants argue the LDENR decision violated the agency's constitutional mandate as public trustee and its own regulation because it failed to assess or weigh the costs of the Project's adverse environmental impacts. Article IX, § 1 of the Louisiana Constitution "imposes a duty of environmental protection on all state agencies and officials, establishes a standard of environmental protection, and mandates the legislature to enact laws to implement fully this policy." *Save Ourselves, Inc. v. Louisiana Env't Control Com'n*, 452 So.2d 1152, 1156 (La. 5/14/1984). The Louisiana Supreme Court explained the constitutional standard of environmental protection:

> The Constitutional standard requires environmental protection "insofar as possible and consistent with the health, safety, and welfare of the people." La. Const. art. IX § 1. This is a rule of reasonableness which requires an agency or official, before granting approval of proposed action affecting the environment, to determine that adverse environmental impacts have been minimized or avoided as much as possible consistently with the public welfare. Thus, **the constitution does not establish environmental protection as an exclusive goal, but requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors.**

*Id.*, 452 So.2d at 1156-57 (emphasis added). In *Save Ourselves Inc.*, the Louisiana Supreme Court determined the record did not show "whether the agency performed its duty to see that the environment would be protected to the fullest extent possible consistent with the health, safety and welfare of the people," as the record was devoid of any evidence that "the agency considered alternate projects, alternate sites or mitigation measures, or whether it made any attempt to quantify environmental costs and weigh them against social and economic benefits of the project." *Id.*, 452 So. 2d at 1160. Therefore, the Supreme Court held that "an administrative order

cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained" and remanded the matter to the court of appeal with directions to remand to the commission for further proceedings. *Id.*

In line with the constitutional mandate of environmental protection, the LDENR was created and is "responsible for the conservation, management, and development of water, minerals, and other such natural resources of the state, including coastal management…." La. R.S. 36:351(B). The LDENR is deemed to have performed its public trust duty in issuing a CUP for a proposed pipeline project if it has considered the following factors:

> (1) whether the proposed project fully minimizes adverse environmental effects; (2) whether alternate projects, alternate sites, or mitigating measures would offer more protection for the environment than the project as proposed without unduly curtailing non-environmental benefits; (3) whether the potential and real adverse environmental effects of the proposed project have been avoided to the maximum extent possible; and (4) whether a cost benefit analysis of the environmental impact costs balanced against the social and economic benefits of the proposed project demonstrate that the latter outweighs the former.

*Joseph*, 2018-414, p. 13, 265 So.3d at 955 (citation omitted),

Turning to the facts of this present case, the record contains the LDENR's Decision, which provides the agency's reasons for granting the CUP to TGPC. As part of the Decision, the LDENR conducted an analysis of the Needs, Justification and Alternatives of the Project and explained:

> [T]he greater the adverse impacts to coastal resources and/or coastal waters, the greater the need for project justification and alternatives analysis to ensure that the project's benefits outweigh the adverse impacts to coastal resources and/or coastal waters and that adverse impacts have been avoided or minimized to the maximum extent practicable.

9

Under the Guidelines, it is the goal of the LDENR to avoid certain adverse impacts – including "land loss, erosion, and subsidence"; "increases in the potential for flooding, hurricane, and other storm damage"; and "detrimental secondary impacts in undisturbed or biologically highly productive wetland areas." LAC 43:I-701(G).[10] When certain adverse impacts are unavoidable, a proposed project is nevertheless

---

[10] Louisiana Administrative Code 43:I-701(G) states:

> It is the policy of the coastal resources program to avoid the following adverse impacts. To this end, all uses and activities shall be planned, sited, designed, constructed, operated, and maintained to avoid to the maximum extent practicable significant:
>
> 1. reductions in the natural supply of sediment and nutrients to the coastal system by alterations of freshwater flow;
> 2. adverse economic impacts on the locality of the use and affected governmental bodies;
> 3. detrimental discharges of inorganic nutrient compounds into coastal waters;
> 4. alterations in the natural concentration of oxygen in coastal waters;
> 5. destruction or adverse alterations of streams, wetland, tidal passes, inshore waters and waterbottoms, beaches, dunes, barrier islands, and other natural biologically valuable areas or protective coastal features;
> 6. adverse disruption of existing social patterns;
> 7. alterations of the natural temperature regime of coastal waters;
> 8. detrimental changes in existing salinity regimes;
> 9. detrimental changes in littoral and sediment transport processes;
> 10. adverse effects of cumulative impacts;
> 11. detrimental discharges of suspended solids into coastal waters, including turbidity resulting from dredging;
> 12. reductions or blockage of water flow or natural circulation patterns within or into an estuarine system or a wetland forest;
> 13. discharges of pathogens or toxic substances into coastal waters;
> 14. adverse alteration or destruction of archaeological, historical, or other cultural resources;
> 15. fostering of detrimental secondary impacts in undisturbed or biologically highly productive wetland areas;
> 16. adverse alteration or destruction of unique or valuable habitats, critical habitat for endangered species, important wildlife or fishery breeding or nursery areas, designated wildlife management or sanctuary areas, or forestlands;
> 17. adverse alteration or destruction of public parks, shoreline access points, public works, designated recreation areas, scenic rivers, or other areas of public use and concern;
> 18. adverse disruptions of coastal wildlife and fishery migratory patterns;
> 19. land loss, erosion, and subsidence;
> 20. increases in the potential for flood, hurricane and other storm damage, or increases in the likelihood that damage will occur from such hazards;
> 21. reduction in the long term biological productivity of the coastal ecosystem.

deemed to be in compliance with the Guidelines if the benefits of the project clearly outweigh the adverse impacts (i.e., costs). LAC 43:I-701(H).[11]

Regarding the LDENR's balancing of environmental costs versus social and economic benefits – and consideration of alternate projects, alternate sites or mitigation measures – the Decision provided:

> Through the alternative analysis provided, TGPC evaluated various alternatives, including a no-action alternative, use of energy conservation measures in lieu of the project, use of alternative energy sources in lieu of natural gas, and evaluation of various system alternatives, design alternatives, CS-529 site alternatives, and looping pipeline routing alternatives in order to identify a preferred project that meets the stated purpose and need of the project while also minimizing adverse environmental and socioeconomic impacts.

> The no action alternative, use of energy conservation measures in lieu of the project, and use of alternative energy sources in lieu of natural gas were all evaluated as potentially less damaging alternatives, however, none were considered viable alternatives since none meet the purpose and need for the project.

---

[11] Louisiana Administrative Code 43:I-701(H) states:

> 1. In those guidelines in which the modifier "maximum extent practicable" is used, the proposed use is in compliance with the guideline if the standard modified by the term is complied with. If the modified standard is not complied with, the use will be in compliance with the guideline if the permitting authority finds, after a systematic consideration of all pertinent information regarding the use, the site and the impacts of the use as set forth in Subsection F above, and a balancing of their relative significance, that the benefits resulting from the proposed use would clearly outweigh the adverse impacts resulting from noncompliance with the modified standard and there are no feasible and practical alternative locations, methods, and practices for the use that are in compliance with the modified standard and:
> > a. significant public benefits will result from the use; or
> > b. the use would serve important regional, state, or national interests, including the national interest in resources and the siting of facilities in the coastal zone identified in the coastal resources program, or;
> > c. the use is coastal water dependent.

> 2. The systematic consideration process shall also result in a determination of those conditions necessary for the use to be in compliance with the guideline. Those conditions shall assure that the use is carried out utilizing those locations, methods, and practices which maximize conformance to the modified standard; are technically, economically, environmentally, socially, and legally feasible and practical; and minimize or offset those adverse impacts listed in §701.G and in the Subsection at issue.

…

> Based on CPRA [Coastal Protection and Restoration Authority] review and comments, the proposed project is deemed consistent with Louisiana's Comprehensive Master Plan for a Sustainable Coast.

> Additionally, in performing a balanced review, the social and economic benefits to the public must outweigh the environmental impacts. In this case, the project will provide direct benefits to the communities located along and near the proposed route through (but not limited to) the creation of temporary construction employment; full-time, local jobs to operate and maintain the compressor station, ROW payments; additional sales tax revenues from the sales of goods and services during construction and long-term to operate and maintain the pipeline; annual State and local community revenue from property taxes, and long-term support of regional contractors, manufacturers, distributers [sic], and retailers through the on-going purchase of goods and services to operate and maintain the project. The overall project cost is estimated at $261 million directly affecting the local, regional, and national workforce by creating over 200 construction jobs. TGPC estimates that approximately $23 million will be distributed in construction payroll to workers over the 12- month construction period, and that these workers will spend as much as 20-30% of their payroll money on goods and services, in addition to money spent on temporary housing. In addition, TGPC anticipates hiring 1-2 new permanent workers to operate and maintain the CS-529 following construction. An estimated $48.35 million is projected to be spent, on equipment, pipe, valves, etc. (including the cost of freight and taxes). An additional $500,000 is estimated to be expended locally and/or regionally for construction materials and fuel. Construction of the project will contribute $150 million in direct spending in materials - the majority of which will be purchased in the United States.

> …

> Overall, the project will provide sustainable economic benefits to the United States and the State of Louisiana by supporting energy independence, increasing employment opportunities, and adding to the demand in many manufacturing sectors.

Appellants maintain the Decision provided a dollar value for the purported benefits yet neglected to offer any quantitative value of the costs for the Project. Citing to *Broome v. Rials*, 2023-01108 (La. 4/26/24), 383 So.3d 578 *reh'g denied*, 2023-01118 (La. 6/27/24), Appellants contend a cost-benefit analysis cannot be reasonable when evidence of either the costs or benefits are ignored. In *Broome*, the

Mayor-President of Baton Rouge challenged the incorporation of an area of South Baton Rouge as a new municipality. The trial court denied the incorporation, and the First Circuit affirmed the trial court's decision. *Broome*, 2023-01108, pp. 2-3, 383 So.3d at 583-4. The Louisiana Supreme Court reversed the decisions of the lower courts to reject incorporation of the municipality, observing "the trial court only considered lost revenue to Baton Rouge, without considering cost-savings from…incorporation." *Id.* at p. 12, 383 So.3d at 589. The Court explained, "[w]ithout evidence of the full economic impact of incorporation, denying incorporation because of an unreasonable economic impact on Baton Rouge is error." *Id.* at p. 17, 383 So.3d at 592.

However, the *Broome* case is not analogous to the matter herein. Here, we are reviewing an agency's permitting actions – the LDENR's CUP decision. Further, *Broome*, does not stand for the proposition that the LDENR must assign a quantitative value to costs. In the context of environmental impacts, related cases recognize a cost-benefit analysis is "not to total up dollars and cents in a sort of profit-loss ledger;" rather, qualitative consideration is adequate. *S. Louisiana Env't Council, Inc. v. Sand*, 629 F.2d 1005, 1013, n.7 (5th Cir. 1980) (citing *Sierra Club v. Morton*, 510 F.2d 813, 827 (5th Cir. 1975)).

For Appellants to assert the LDENR failed to assess or weigh the costs of the Project's adverse environmental impacts is inaccurate. In weighing the potential environmental costs, the LDENR considered adverse impacts of the Project. Specific to the potential for flood, hurricanes, or other storm damage, the LDENR determined:

> [T]he issuance of this CUP will not increase the risk of flooding to this area. [TGPC] has stated as part of the hydrologic impact analysis that no effects are expected between existing and post-construction

13

hydrologic conditions including local topography, slope, surface condition, drainage pattern, storm event response, overland flow, or runoff. The proposed pipeline will be buried a minimum of 3 feet below ground surface elevation and will not otherwise disrupt water flow during a tropical or other flood event.

Considering this Project involves underground pipelines, no surface impacts will occur. Nevertheless, a hole will need to be dug to set the pipes in, and that hole will have to be backfilled. In order to guarantee the affected wetlands are restored, the LDENR required TGPC to conduct a monitoring program following a complete growing season to ensure the area is restored to its previous, natural state and that no other remedial action is necessary.

Throughout the Decision, the LDENR assessed alternatives to pipeline expansion, compression station design and site locations, and looping pipeline construction, with TGPC re-evaluating and adopting certain alternative measures that proved to be the least damaging feasible alternative, yet still met the purpose and need for the Project. In considering alternatives to pipeline expansion, the LDENR explained:

> TGPC adopted one of the system alternatives considered, the Leased Capacity, as an alternative to expanding its pipeline system from Midcontinent Express Pipeline, LLC to Toca Lateral, which greatly reduced potential environmental impacts, by eliminating the need of additional pipeline. Three other system alternatives…were eliminated from consideration for various reasons including greater environmental impacts (wetlands and water bodies), significantly higher costs, increased air emissions, increased maintenance, and potential for hazardous spills during normal operations.

The LDENR proceeded to discuss alternative design and location options for CS-529:

> Consideration was given to an alternative design option, an electric motor driven compression alternative at CS-529 in lieu of a solar, gas driven turbine compressor unit, however, this alternative would require additional wetland impacts, and would lack the relative efficiency, reliability, ease of repair, availability of replacement parts, when

14

compared to a solar, gas driven turbine compressor unit and when comparing the cost of fuel gas to electric power.

Site location alternatives for CS-529 were compared based on an evaluation of several criteria including parcel size, land cover type (developed, wetlands, open water), soils, requirement of additional pipeline, groundwater and floodplains, sensitive species and habitat, cultural resources, public lands, access roads, and noise sensitive areas…Of the three alternatives considered, two alternatives were eliminated due to increases in wetland and open water impacts, increases in prime farmland soil conversion, need for additional road crossings, and uncertainty regarding a Phase I Environmental Site Assessment evaluation.

Additionally, the LDENR elaborated on the looping pipeline construction:

Looping pipeline routing alternatives were evaluated using various criteria similar to those discussed above for siting CS-529 including footprint size (length of line, number of road/railroad crossing, HDD [horizontal directional drilling] crossings, residential areas), the number of wetland and waterbody crossing, land cover type impacts (open land, developed, wetlands, open water), soils (prime farmland soils centerline crossings), groundwater and floodplains, sensitive species and habitat, cultural resources, and public land crossings. Four major route alternatives were evaluated for the Yscloskey Toca Lateral Loop and two route variations were considered for the Grand Bayou Loop…Alternative looping pipeline routes considered were eliminated based on a combination of number of reasons including having greater impacts to wetlands or waterbodies, crossing a greater distance of prime farmland soils, more known archaeological sites within 0.5 miles of route, requirement of additional HDD, and the method for crossing the Verret to Caernarvon Floodwall.

A combination of construction methods are proposed to be utilized along the line route to minimize adverse impacts on environmentally sensitive areas including wetlands and water bodies such as open-cut, push/float, and horizontal directional drilling (HDD) methods. Justification was provided by [TGPC] regarding why other alternative methods of line installation were not feasible since such methods would not result in a reduction of impacts to vegetated wetlands…

…

For the Yscloskey Toca Lateral Loop, TGPC has developed a proactive soil, elevation, and vegetative restoration plan to address OCM [LDENR] concerns…that the 114.37 acres of temporary brackish marsh impacts may not fully recover following a growing season after construction and that such impacts could become permanent across workspace areas along this section of line installation.

…

> For the Grand Bayou Loop, OCM requested that TGPC re-evaluate the conditions and requirements for construction…which resulted in the avoidance of wetland impacts within the majority of the construction workspace…Because of this re-evaluation, the integrity of the bankline will be maintained and impacts to wetlands have been avoided to the maximum extent practicable resulting in a significant reduction in the overall wetland impacts for the project. Originally, [TGPC] proposed 42.53 acres of impact to brackish marsh habitat along the Grand Bayou Loop, and through re-evaluation of less damaging construction alternatives, this impact has now been reduced to 0.52 acres.

The LDENR concluded its review of alternative sites/methods as follows:

> A review of the project plats and additional information listed above demonstrate that the proposed alternative is the least damaging feasible alternative. For the Yscloskey Toca Lateral Loop, collocated looping routes were selected to minimize disturbances to wetlands and waterbodies to the greatest extent practical, which allows for some overlap of workspace with areas of the existing route that have been previously disturbed and minimizes the amount of new right-of-way that would be necessary to be disturbed if a completely undisturbed route was selected…When wetland impacts have not been able to be avoided along the Yscloskey Toca Lateral Loop, TGPC has developed a proactive soil, elevation, and vegetative restoration plan to actively restore the construction ROW during pipeline construction including the restoration of…all temporarily impacted wetland habitat and the net creation of 4.35 acres of new marsh habitat where open water previously existed. Through re-evaluation of alternate construction methods, almost 99% of impacts to wetlands along the Grand Bayou Loop have been avoided. The new Compressor Station 529 is partly located on the existing site of a previously abandoned compressor station owned by TGPC. This review of alternative sites/methods concludes that there are no lesser damaging feasible sites, locations, alignments and/or alternative construction techniques that are reasonable for the currently proposed project.

After reviewing the record in this case, we find the LDENR adequately weighed the costs of the Project's adverse environmental impacts and ultimately determined the social and economic benefits outweighed these costs.

***Argument Number Two: The LDENR expressly declined or failed to consider categories of real and potential adverse environmental impacts – as required by the Guidelines and Constitution – including potential impacts from pipeline***

***system leaks, accidents, and explosions, and cumulative and secondary impacts
related to climate change.***

Appellants contend the LDENR failed to adequately consider the Project's
potential, cumulative, and secondary impacts as required by the Constitution,
SLCRMA, and Guidelines. Cumulative impacts are "impacts increasing in
significance due to the collective effects of a number of activities," whereas
secondary impacts are impacts that would "(1) result from the proposed activity; (2)
cause significant modifications or alterations to the physical characteristics of
acreage beyond the limit of the area depicted as being altered in the accepted permit
application drawings; and (3) be identified and quantified by the secretary based on
an evaluation of similar and previously implemented activities." LAC 43:I-700.
Under Guideline 701(F)(15), the LDENR shall utilize information regarding the
"likelihood of, and extent of impacts of, resulting secondary impacts and cumulative
impacts" in evaluating whether a proposed project is in compliance with the
Guidelines. Further, under Guideline 701(G)(10), proposed projects "shall be
planned, sited, designed, constructed, operated, and maintained to avoid to the
maximum extent practicable significant…adverse effects of cumulative impacts."

Appellants posit two arguments concerning adverse environmental impacts.
First, Appellants aver the LDENR failed to address the Project's potential adverse
environmental impacts – risks of leaks, accidents and explosions during the
operation of the methane pipeline system. We disagree. In its Decision, the LDENR
referenced the Spill Prevention, Control, and Countermeasures (SPCC) Plan –
provided by TGPC – which "provides preventative and mitigation measures to be
employed by TGPC during construction of the project and/or operations and
maintenance activities for the project facilities." According to TGPC, the SPCC Plan

17

is comprised of approved spill control plans that it has successfully utilized in the past and are "established to minimize the environmental impact associated with spills or releases at fuel, lubricant, or hazardous materials storage areas, during normal upland construction and refueling activities, and during special refueling activities within 100 feet of perennial stream banks, wetland boundaries, or within municipal watersheds." This Plan will be implemented and overseen by an environmental inspector, and should a spill occur, the National Response Center "will be notified immediately if spills above threshold levels (Clean Water Act, 40 CFR 110.10) occur into surface waters and/or wetlands", combined with the reporting requirements under the Guidelines. Additionally, in order to avoid any pipeline malfunctions that could potentially lead to a pipeline explosion, TGPC's Project plans provide that "[a]ll controls and safety equipment and systems, including emergency shutdown, relief valves, gas and fire detection, engine over speed, and vibration detection, will be installed, checked, and tested before being placed into service. Before being placed into service, all controls and safety equipment will be checked and tested for proper functioning." Moreover, regarding operation and maintenance procedures, TGPC explained:

> Operations at the Project sites will be monitored electronically on a continuous basis and emergency shutdown ("ESD") equipment will be installed. When activated, the ESD System stops the turbines, isolates and vents the compressor piping, and routes the gas away from the compressor station. During the venting process, natural gas is released through a stack in a remote area of the compressor station yard. The system also will react when fire or gas is detected within the compressor building or facility area. Detection systems will respond to and initiate a requisite ESD of the facility.

The LDENR was provided with a substantial amount of information regarding potential pipeline system leaks, accidents, and explosions and ultimately determined that the Project met the Guidelines requirements.

Second, Appellants argue the LDENR failed to apply Guideline 701 to avoid the Project's cumulative and secondary impacts related to climate change. The SLCRMA directs the LDENR to develop an "overall state coastal management program" and to develop the guidelines, which serve as the criteria for granting coastal use permits. La. R.S. 49:214.27. Moreover, the SLCRMA provides the LDENR should adopt guidelines and regulations in accordance with the "constitutional and statutory authorities affecting coastal use" and that those guidelines and regulations "shall not be interpreted to allow expansion of governmental authority beyond those laws." La. R.S. 49:214.22(2)(a). Therefore, the LDENR has no authority to expand the SLCRMA or the Guidelines to interests outside of the coastal zone. In its Decision, the LDENR recognized its limitation and expressed, "[r]egarding the concerns for the impact of greenhouse gases upon global climate change, this topic is beyond the scope of the project review under the coastal use guidelines. While the guidelines do address cumulative and secondary impacts, these are limited to the localized effects in coastal Louisiana." The LDENR further explained:

> For global climate change to be a consideration, there would have to be an extension of the guidelines incorporated into a state or national program that directs energy production toward a reduction of fossil fuel sources and increasing use of renewable fuels. At this time, there is no consistent energy policy nationally or in the state, that provides guidance for reducing or replacing fossil fuel sources of energy. Without an overarching system of state and/or national policy, incentives and directives, standing upon the Coastal Use Guidelines in an isolated effort to change the global energy policy, is unrealistic and unachievable. The OCM cannot base its decision for this project on the impacts of a global phenomenon upon which it has no effect. Climate change is currently beyond the scope of this review.

As such, there is no legal authority requiring the LDENR to consider global impacts on overall climate change when issuing a CUP. Concerning the Project's coastal

zone impacts of climate change, the LDENR required TGPC to provide a mitigation plan to account for potential impacts, such as land loss. Finally, the LDENR recognized the minimal amounts of greenhouse gas emissions from the emergency generator and other stationary fuel combustion sources at the compressor stations, and per TGPC's Air and Noise Quality Report, TGPC will comply with all Louisiana Department of Environmental Quality (LDEQ) requirements for greenhouse gas regulations and reporting requirements to the U.S. Environmental Protection Agency (EPA).

Based on the entirety of the record on review, we find the LDENR considered the real and potential adverse environmental impacts of the Project, and predicated on its understanding and interpretation of its own rules and regulations, reasonably concluded the Project met all requirements under the Guidelines.

***Argument Number Three: The LDENR failed to apply Guideline 711.A asserting the Project is "neither commercial nor industrial," thus it could substitute one applicable Guideline for another despite Guideline 701's directive to comply with "all applicable guidelines."***

Appellants assert the LDENR failed to apply Guideline 711(A) by determining the Project is "neither commercial nor industrial." Guideline 711 concerns "Guidelines for Surface Alterations" and Section (A) specifically provides:

> Industrial, commercial, urban, residential, and recreational uses are necessary to provide adequate economic growth and development. To this end, such uses will be encouraged in those areas of the coastal zone that are suitable for development. Those uses shall be consistent with the other guidelines and shall, to the maximum extent practicable, take place only:
>
> 1. on lands 5 feet or more above sea level or within fast lands; or
>
> 2. on lands which have foundation conditions sufficiently stable to support the use, and where flood and storm hazards are minimal or where protection from these hazards can be reasonably well achieved, and where the public safety would not be unreasonably endangered, and:

a. the land is already in high intensity of development use; or

b. there is adequate supporting infrastructure; or

c. the vicinity has a tradition of use for similar habitation or development.

Surface alternations are "those uses and activities which change the surface or usability of a land area or water bottom." LAC 43:I-700. Examples of surface alterations are "fill deposition, land reclamation, beach nourishment, dredging (primarily areal), clearing, draining, surface mining, construction and operation of transportation, mineral, energy and industrial facilities, and industrial, commercial, and urban developments." *Id.* In its Decision, under the discussion of Guideline 711, the LDENR concluded:

> This section of the Guidelines applies to surface alterations. Surface alterations occurring as a result of actions proposed under this permit application include construction activities within the proposed right-of-way of the pipeline, access road construction, and lands utilized for additional temporary workspaces. . . Section A of the guideline applies to industrial, commercial, urban, residential, and recreational uses and is therefore not applicable to this project. Furthermore, Section A is not applicable because the proposed activity is neither industrial nor commercial–the project itself is not the production of goods and services, nor is it engaged in commerce. The more specific guideline relating to the proposed use is 719.

The Fifth Circuit addressed a similar issue, in *Joseph*, in which the LDENR determined that Guideline 711(A) was not applicable to the proposed pipeline project. In *Joseph*, the district court found the LDENR did not apply Guideline 711(A) despite its applicability to the proposed project. 2018-414, p. 7, 265 So.3d at 951. On appeal, the Fifth Circuit found the district court erred in not deferring to the LDENR's determination that Guideline 711(A) was not applicable. *Id.* The LDENR determined the proposed project would cause the following surface alterations – "'construction activities within the proposed right-of-way of the pipeline, temporary and permanent access road construction, and lands cleared for additional temporary

21

workspaces'" – and reasoned Guideline 711(A) was not applicable because "the surface of the land will be returned to pre-existing contour and the proposed activity is neither industrial nor commercial, specifically the project itself is not the production of goods and services, nor is it engaged in commerce." *Id.* at pp. 7-8, 265 So.3d at 951-52. On judicial review, the district court conceded "'that once constructed, use of the pipeline would not result in a surface alteration,'" however found "'it cannot be disputed that once constructed, use of the pipeline could conceivably change usability of the land.'" *Id.* at p. 7, 265 So.3d at 951.

The Fifth Circuit found the LDENR's conclusion – that Guideline 711(A) did not apply – was not unreasonable for the following reasons:

- The proposed pipeline would be buried at least three feet below the ground, therefore, no commercial or industrial activity would take place on the surface of the earth;

- "[T]he surface of the land [would] be returned to pre-existing contour" as the surface alterations caused by the proposed project would cease upon completion of construction activities;

- The proposed pipeline would be "routed through an existing utility right-of-way" and "makes use of existing corridors to the maximum extent practicable;" and

- The proposed pipeline "would not increase the risk of flooding or otherwise disrupt water flow during a potential flood event."

*Id.* at p. 8, 265 So.3d at 952.

An examination of the Project before this Court reveals its similarities to the proposed pipeline project in *Joseph*. The Project has three components: (1)

22

construction of two looping pipelines; (2) construction of a new compressor station – CS 529; and (3) modification of an existing compressor station – CS 527. Just as the proposed pipeline was buried below the ground in *Joseph*, the looping pipelines will be buried three feet under the ground and placed along TGPC's existing right-of-ways in those areas. Also, just as in *Joseph*, the Project will not increase the risk of flooding in the area as the LDENR determined – after reviewing TGPC's Compensatory Mitigation and Monitoring Plan ("Mitigation Plan") and Hydrologic Modification Impact Analysis ("Hydrologic Analysis") – "no effects are expected between existing and post-construction hydrologic conditions" and the pipelines "will not disrupt water flow during a tropical or flood event." Finally, the LDENR concluded the Project site will be restored to "pre-[P]roject elevations and contour," just as it did in *Joseph*.

In order to ensure the surface of the land is returned to its natural, pre-Project state, the LDENR conditioned issuance of the CUP on implementation of the Mitigation Plan. The Mitigation Plan was created to "offset unavoidable impacts to jurisdictional waters (e.g., wetlands and waterbodies) that result in loss of functions" due to the Project. According to the Mitigation Plan, TGPC's approach to monitoring this Project is a three-step process: (1) "restore the overwhelming majority of jurisdictional features (e.g., wetlands and waterbodies)…;" (2) "monitor the restoration efforts by collection and evaluation of pre- and post-construction elevations and vegetation;" and (3) "mitigation bank credit purchase(s) for areas which will not be restored…or have long regrowth periods…." Under the monitoring step, TGPC has established three monitoring events for the Project: (1) pre-construction event; (2) restoration completion; and (3) one year following a complete growing season. TGPC will complete a report following each event

including a final report after a complete growing season to determine whether restoration was successful or if future remedial actions are required.

Additionally, TGPC conducted a Hydrologic Analysis to ensure no surface water impacts or potential flooding would occur as a result of the Project. The LDENR reviewed TGPC's Hydrologic Analysis, and under its analysis of "reduction or blockage of water flow," concluded the proposed Project would not cause hydrologic or flooding complications. Further, in reviewing "potential for flood, hurricanes, and other storm damages," the LDENR relied on the Hydrologic Analysis' conclusion that "no effects are expected between existing and post-construction hydrologic conditions including local topography, slope, surface condition, drainage pattern, storm event response, overland flow, or runoff."

The Project is also comprised of two compressor stations – CS 527 and CS 529. CS 527 will not be a new construction; rather, it is a modification of an existing compressor station. For CS 527, "all [modification] work will occur above-ground and will be located within the original footprint of construction of the existing CS 527 fenced yard." As such, the modification of the existing compressor station – CS 527 – should not be considered a "surface alteration" as it does not "change the surface or usability of [the] land" that the existing CS 527 currently occupies. Conversely, CS 529 will be a new construction located at an existing abandoned compressor station site owed by TGPC. However, a portion of CS 529's construction will occur within designated fastlands[12], which are not subject to CUP

---

[12] Fastlands are "lands surrounded by publicly-owned, maintained, or otherwise validly existing levees or natural formations as of January 1, 1979, or as may be lawfully constructed in the future, which levees or natural formations would normally prevent activities, not to include the pumping of water for drainage purposes, within the surrounded area from having direct and significant impacts on coastal waters." LAC 43:I-700. According to La. R.S. 49:214.34 (A)(2), "[a]ctivities occurring within fast lands…" do not require a CUP.

requirements.[13] Moreover, the LDENR decided the Project – which includes the compressor station construction – "is not the production of goods and services, nor is it engaged in commerce," consequently, the Project is "neither industrial nor commercial."

Considering the record on review and the deference given to an administrative agency's construction and interpretation of its own rules and regulations, we find the LDENR was not unreasonable or arbitrary in finding that Guideline 711(A) was not applicable to this Project.

***Argument Number Four: The trial court correctly rejected the LDENR's rationale for not applying Guideline 711(A), but erred in upholding the LDENR's decision on a different, yet flawed basis.***

Appellants maintain the trial court correctly rejected the LDENR's rationale for not applying Guideline 711(A), but incorrectly upheld the LDENR's decision on a different, yet flawed basis. In the analysis portion of the district court's judgment and reasons for judgment, the district court disagreed with the LDENR's determination that Guideline 711(A) did not apply because the Project is neither commercial nor industrial. The district court explained, in part, "While the Court believes arguments could be validly made that this activity is likely a combination of both, the Court would reason that this activity is absolutely commercial…The entire permit applications need is based upon a commercial contract to provide a good to a processing facility." The district court ultimately concluded, based on the record, that "…if applicable, the requirements of §711.A are satisfied" noting

---

[13] According to TGPC's Hydrologic Analysis, "[a]pproximately 0.8 miles of the YTL Loop, including one bi-directional pig launcher and receiver facility located at the Toca Facility, and PAR-1 and PAR-2 are within designated fastlands. . . ." Additionally, during the November 20, 2023 hearing, counsel for TGPC informed the district court that the compressor station located in St. Bernard – CS 529 – will be located in fastlands, and this statement was not refuted by the Appellants.

"…this project is being constructed within the fastlands which satisfies the requirements o[f] §711.A.1."

There are several points that could be addressed concerning the district court's reasons for judgment. However, dispositive of these issues is the fact that this Court recognizes "'[r]easons for judgment do not form part of the judgment, and appellate courts review judgments, not reasons for judgment.'" *Williams v. Louisiana Tax Comm'n*, 2023-0079, p. 10 (La. App. 4 Cir. 11/28/23), 378 So.3d 137, 144 (citing *Wooley v. Lucksinger*, 2009-0571, p. 77 (La. 4/1/11), 61 So.3d 507, 572). Any alleged error in the district court's reasoning is irrelevant to our review of the judgment, which affirmed the LDENR's approval of the Project and granting of the CUP to TGPC. Furthermore, as previously noted, this Court's review of the LDENR's Decision is based on the findings and decision of the LDENR and not the district court's decision. *See St. John the Baptist Par.*, 2019-357, p. 7, 290 So.3d at 297. This Court has already determined the LDENR was not unreasonable or arbitrary in its construction and interpretation of "industrial" and "commercial" and finding that Guideline 711(A) was not applicable to this Project. Therefore, Appellants' argument concerning the district court's flawed basis in its reasons for judgment is immaterial to our review of the LDENR's decision to approve the issuance of the CUP to TPGC.

Considering the entirety of the record, we conclude the LDENR satisfied its public trust duty, the SLCRMA, and its own Guidelines relative to the issuance of a CUP to TGPC. This Court takes into consideration the factors for judicial review of an administrative agency's decisions and concludes the LDENR's Decision was supported by the record, was neither arbitrary nor capricious, and did not violate any constitutional or statutory provisions.

26

## **<u>DECREE</u>**

For the foregoing reasons, we affirm the district court's February 2, 2024 judgment upholding the LDENR's decision to approve the CUP in favor of TGPC.

**AFFIRMED**